**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JARRETT CARTER, *et al.,*
*on their own behalf and on behalf of all*
*others similarly situated*

    *Plaintiffs,*

    *v.*

VINEYARD VINES, LLC,

    *Defendant.*

Civil Action No. ELH-25-3178

**MEMORANDUM OPINION**

In this putative class action, three named plaintiffs—Maryland residents Jarrett Carter and Elizabeth Nielsen, and Indiana resident Brian Ayers—filed suit against Vineyard Vines, LLC ("Vineyard Vines", "Company", or "VV"), a Connecticut limited liability company. ECF 7, ¶¶ 10-13. The "Class Action Complaint" (ECF 7) was initially filed in the Circuit Court for Baltimore County. Defendant removed the case to federal court on September 24, 2025, on two grounds: Diversity jurisdiction under 28 U.S.C. § 1332(a)(1), and the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). *See* ECF 1.

Plaintiffs allege that Vineyard Vines violated the Maryland Commercial Electronic Mail Act ("MCEMA"), Md. Code §§ 14-3001 *et seq*. of the Commercial Law Article ("C.L."), and Indiana's Deceptive Commercial Electronic Mail Act ("IDCEMA"), Ind. Code Ann. §§ 24-5-22-1 *et seq*. (collectively, the "Email Statutes" or the "Anti-Spam Statutes"), by disseminating marketing emails containing false or misleading information in the subject lines "with the capacity, tendency, or effect of deceiving the recipient." ECF 7, ¶ 2. The Email Statutes permit a plaintiff to recover $500 for each statutory violation. C.L. § 14-3003; Ind. Code Ann. § 24-5-22-10.

The Complaint contains two counts.  Count One alleges violations of MCEMA on behalf of a Maryland Class, and Count Two alleges violations of IDCEMA on behalf of an Indiana Class. *Id.* ¶¶ 94-131.  Plaintiffs seek class certification, statutory and exemplary damages, injunctive relief, attorneys' fees, and costs.  *Id.* at 43-45.[1]

Plaintiffs have moved to remand the case to State court.  *See* ECF 6 ("Remand Motion"). However, they do not argue for a remand based on a lack of diversity or a failure to satisfy CAFA, *i.e.*, the grounds asserted by the Company as a basis for removal.  Rather, they contend that they have not alleged facts to support a finding that they have Article III standing.  Plaintiffs posit that they merely allege statutory violations by VV and, under federal law, a statutory violation, without more, does not establish a concrete injury.  *Id.* at 1, 5.  Accordingly, plaintiffs assert that their claims, which arise under state statutes, must be pursued in a state court.  *Id.* at 1 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)).[2]

---

[1] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not necessarily correspond to the page number imprinted on a particular submission.

[2] Defendant does not contest the Court's personal jurisdiction over it as to Ayers's IDCEMA claim, which arises from emails sent by VV to Indiana, not Maryland.  But, the case of *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017), requires specific personal jurisdiction over defendant as to each named plaintiff's claims in a putative class action.  That is, the named plaintiff's claims must "aris[e] out of or relat[e] to the defendant's contacts with the forum."  *Id.* at 262 (cleaned up).

Defendant had contact with Maryland as to the Maryland plaintiffs.  But, under *Bristol-Myers Squibb Co.*, 582 U.S. at 260, defendant's Maryland contacts do not extend to support specific personal jurisdiction over defendant as to Ayers's claim.  *See Lincoln v. Ford Motor Co.*, JKB-19-2741, 2020 WL 5820985, at *5 (D. Md. Sept. 29, 2020) ("[T]his Court will require each named plaintiff in a class action suit to demonstrate personal jurisdiction over a defendant"); *Roy v. FedEx Ground Package Sys.*, 353 F. Supp. 3d 43, 56-57 (D. Mass. 2018) ("District courts generally have extended the specific jurisdiction principles articulated in *Bristol-Myers* to the analysis of personal jurisdiction over named plaintiffs in federal class actions."); *Shell v. Shell Oil Co.*, 165 F. Supp. 2d 1096, 1107 n.5 (C.D. Cal. 2001) (stating that "it is by now well settled that [venue and personal jurisdiction requirements] to

Defendant opposes the Remand Motion. *See* ECF 30 (the "Opposition"). It maintains that the alleged transmission of voluminous and deceptive marketing emails is sufficient to constitute the injury required to establish Article III standing. *Id.* at 3.

Plaintiffs replied. ECF 41 (the "Reply"). And, for the first time, they request seek attorney's fees, pursuant to 28 U.S.C. § 1447(c). *Id.* at 26. According to plaintiffs, defendant's mischaracterization of the Complaint and misrepresentations of the current state of the law warrant an award of legal fees. *Id.* at 27.

Defendant has filed a "Motion for Leave to File Surreply in Opposition to Plaintiffs' Motion to Remand." *See* ECF 43 ("Surreply Motion"). Despite the title, the Surreply Motion only pertains to plaintiffs' request for attorneys' fees in connection with the Remand Motion. *Id.* at 2. As noted, plaintiffs made that request in their Reply.

In addition, defendant has filed a "Motion to Dismiss Plaintiffs' Complaint." *See* ECF 31 ("Motion to Dismiss"). Plaintiffs oppose the Motion to Dismiss. *See* ECF 44. Defendant has replied. *See* ECF 50.

The parties have also filed several notices of supplemental authority. *See* ECF 51; ECF 52; ECF 53; ECF 54; ECF 55; ECF 56; ECF 59; ECF 60; ECF 61. On March 10, 2026, defendant responded to one of plaintiffs' notices of supplemental authority, arguing that the cases identified

---

[file] suit must be satisfied for *each and every named plaintiff* for the suit to go forward") (emphasis in the original).

In the motion to dismiss filed by Vineyard Vines (ECF 31), the Company does not raise an argument as to personal jurisdiction with respect to Ayers. Pursuant to Fed. R. Civ. P. 12(b)(2), 12(g), and 12(h)(1), VV appears to have waived its right in this Court to assert lack of personal jurisdiction. In any event, because the Court concludes it lacks subject matter jurisdiction, and because defendant has not raised the issue of personal jurisdiction as to Ayers, I need not address whether the Court has personal jurisdiction over Vineyard Vines with respect to Ayers's claim. I express no opinion as to whether a waiver in this Court precludes an assertion of the defense on remand.

by plaintiffs are inapplicable and providing additional authorities. ECF 56. Plaintiffs have moved to strike that response, characterizing it as "an improper surreply." ECF 57 ("Motion to Strike"), at 1. VV opposes the Motion to Strike. ECF 58.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Remand Motion. But, I shall deny plaintiffs' request for attorneys' fees. Therefore, I shall deny, as moot, defendant's Surreply Motion. I shall also deny defendant's Motion to Dismiss, without prejudice to defendant's right to renew the motion in State court. In addition, I shall deny the Motion to Strike.

## I. Factual Summary[3]

Plaintiffs allege that Vineyard Vines engaged in two types of deceptive email practices. *See* ECF 7. First, Vineyard Vines sent emails with subject lines representing that a sale or promotion was ending imminently, using phrases such as "FINAL HOURS," "ENDS TONIGHT," "LAST DAY," and "LAST CHANCE," when, in fact, the promotions continued beyond the advertised end dates, often until the next day. *Id.* ¶¶ 2, 28-40. Vineyard Vines would then send follow-up emails announcing that the sales had been "EXTENDED," when, according to plaintiffs, the extension was never a genuine extension at all. *Id.* ¶ 29. Rather, it was part of a pre-planned marketing strategy. *Id.* Second, the Company sent emails advertising a "free gift," without disclosing that the recipient was required to make a minimum purchase, ranging from $150 to $250, to obtain the gift. *Id.* ¶¶ 41-47. In other words, "the 'free gift' was not actually free . . . ." *Id.* ¶ 42.

The Complaint provides numerous examples of both practices. With respect to false urgency, on June 15, 2025, Vineyard Vines sent an email with the subject line "Today Only: FREE

---

[3] The Factual Summary is drawn from the Complaint. ECF 7.

SHIPPING On All Orders + 40% Off Tees." *Id.* ¶ 30; *see id.* ¶ 33. The following day, June 16, 2025, Vineyard Vines sent an email stating: "LAST DAY: 40% Off Tees & More Summer Styles!" *Id.* ¶ 31; *see id.* ¶¶ 34, 38. Yet, the next day, on June 17, 2025, the Company sent an email announcing "40% Tees + 30% Off Shorts, Polos & Swim EXTENDED[.]" *Id.* ¶ 32. Then, on June 19, 2025, Vineyard Vines sent an email with the subject line "IT'S ON! 40% Off Tees + 30% Off Summer Styles," demonstrating that the sale had never actually ended, as represented. *Id.* ¶ 38. As another example, on May 11, 2025, Vineyard Vines sent an email stating "ENDS TONIGHT: 50% Off Everything!," only to send an email the very next day, May 12, 2025, announcing "NOW EXTENDED: 50% Off Everything." *Id.* ¶¶ 35, 36. Similarly, on November 20, 2024, Vineyard Vines sent an email with a subject line stating: "ONLINE BLACK FRIDAY SALE ENDS TONIGHT!" *Id.* ¶ 37. And, on November 21, 2024, the Company followed up with an email with subject line: "Online Black Friday Sale EXTENDED TODAY ONLY." *Id.*

With respect to the "free gift" misrepresentations, on May 9, 2024, Vineyard Vines sent an email with the subject line "OUTLET: Stop In For A FREE GIFT For Mothers Day," without disclosing that customers had to spend at least $250 to obtain the gift. *Id.* ¶ 41. Vineyard Vines also sent an email on April 25, 2025, with the subject line "In Stores Tomorrow: FREE GIFT For Mom!," without disclosing the same $250 minimum purchase requirement. *Id.* ¶¶ 43, 44. Likewise, on December 2, 2024, Vineyard Vines sent multiple emails advertising a "Free Gift" in connection with its Cyber Monday sale, including subject lines such as "Cyber Monday: Up To 60% Off SITEWIDE + Free Gift!" and "FREE Gift AND Up To 60% Off Sitewide," but without disclosing that a minimum purchase of $150 was required. *Id.* ¶¶ 45-47.

According to plaintiffs, Vineyard Vines may send a single consumer up to five marketing emails per day and commonly sends three per day, many advertising purportedly limited-time

offers.  *Id.* ¶ 27.  Further, plaintiffs allege that Vineyard Vines knew or had reason to know that the recipients of these emails were Maryland and Indiana residents, based on shipping and billing addresses associated with customer accounts, telephone area codes, in-store account sign-ups, and various "on tracking technologies."  *Id.* ¶ 53; *see id.* ¶¶ 48-56.

Moreover, Vineyard Vines encourages its shoppers to create online accounts.  *Id.* ¶ 51. Plaintiffs allege:  "Customers save information in their Vineyard Vines accounts along with their email address, such as shipping addresses, billing addresses, and phone numbers."  *Id.*  According to plaintiffs, "discovery will show that Vineyard Vines employs methods to track the effectiveness of its marketing emails and to identify consumers that click on links contained in Vineyard Vines's marketing emails, including by identifying their physical location."  *Id.* ¶ 52.

Each of the three named plaintiffs, Carter, Nielsen, and Ayers, had an account with Vineyard Vines, and provided defendant with their email addresses, shipping addresses, billing addresses, and phone numbers. *Id.* ¶¶ 60, 67, 74, 101, 120.  Those accounts reflect home addresses in Maryland for Carter and Nielsen and in Indiana for Ayers. *Id.* ¶¶ 60, 67, 74.  Plaintiffs made purchases through those accounts that were delivered to their respective residences.  *Id.*

Carter identified at least 39 allegedly deceptive emails received between December 2023 and July 2025; Nielsen identified at least 44; Ayers identified at least 32. *Id.* ¶ 78.  Plaintiffs note that these figures are likely underestimated, as they deleted some of the emails they received from Vineyard Vines.  *Id.*  And, plaintiffs continue to receive emails from Vineyard Vines with allegedly false and misleading information in the subject lines.  *Id.*

**II. Legal Standards**

**A.**

Under 28 U.S.C. § 1441(a), the general removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" may be "removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." But, "removal jurisdiction raises significant federalism concerns." *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941)).

In particular, federal courts are "courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014). They "may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). Therefore, a federal court must presume that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper. *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (citing *Kokkonen*, 511 U.S. at 377). And, Congress may not confer jurisdiction absent a constitutional basis. *Shamrock Oil*, 313 U.S. at 108–09 ("The power reserved to the states under the Constitution to provide for the determination of controversies in their courts, may be restricted only by the action of Congress in conformity to the Judiciary Articles of the Constitution."). Accordingly, courts "must strictly construe" removal statutes and resolve all doubts in favor of remanding a case to state court. *Mulcahey*, 29 F.3d at 151.

The burden of demonstrating jurisdiction and the propriety of removal rests with the removing party. *See McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (Agee, J.,

concurring in part and dissenting in part), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (en banc); *Mulcahey*, 29 F.3d at 151. Therefore, "[i]f a plaintiff files suit in state court and the defendant seeks to adjudicate the matter in federal court through removal, it is the defendant who carries the burden of alleging in his notice of removal and, if challenged, demonstrating the court's jurisdiction over the matter." *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008). In this way, a failure of proof that jurisdiction exists cuts against the removing party. And, if "a case was not properly removed, because it was not within the original jurisdiction" of the federal court, then "the district court must remand [the case] to the state court from which it was removed." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 8 (1983) (citing 28 U.S.C. § 1447(c)).

Of import, "[t]he determination of jurisdiction is based only on the allegations in the plaintiff's well-pleaded complaint—not on any issue the defendant may raise." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025) (citation omitted); *see also Black v. Mantei & Assocs., Ltd.*, 145 F.4th 528, 535 (4th Cir. 2025) (same); *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) ("A district court may limit its standing inquiry to the allegations of the complaint"). Moreover, "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 809 n.6 (1986).

**B.**

As noted, defendant removed the case from State court, asserting diversity jurisdiction and jurisdiction under CAFA. *See* ECF 1. But, as indicated, plaintiffs do not challenge either statutory basis for removal. *See* ECF 6 at 1. Rather, they contest standing under Article III of the Constitution. And, the Court has an independent duty to determine whether it possesses subject

8

matter jurisdiction. *Wells v. Johnson*, 150 F.4th 289, 297 (4th Cir. 2025) (stating that "federal courts must confirm for themselves that they have jurisdiction. That duty includes ensuring that a plaintiff has standing.").

**1.**

Diversity jurisdiction under 28 U.S.C. § 1332(a)(1) requires: (1) Complete diversity of citizenship between all plaintiffs and all defendants; and (2) an amount in controversy exceeding $75,000, exclusive of interest and costs, as to each plaintiff. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).

Plaintiffs are domiciled in Maryland and Indiana. ECF 7, ¶¶ 10-12. Vineyard Vines is a Connecticut limited liability company organized in the State of Connecticut. *Id.* ¶ 13. In its Notice of Removal, defendant states: "The members of Vineyard Vines are Shepherd Murray, Ian Murray, and their respective family trusts, for which they are the sole trustees. Shepherd Murray and Ian Murray are both domiciled in the State of Connecticut and, therefore, are citizens of the State of Connecticut for removal purposes. Because both Shephard [sic] Murray and Ian Murray are citizens of the State of Connecticut, so are the family trusts for which they serve as trustees." ECF 1 at 5.

For diversity purposes, the citizenship of a limited liability company "is determined by the citizenship of all of its members." *Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). In the Fourth Circuit, "[i]t is an open question . . . whether the citizenship of . . . trusts . . . is based on the citizenship of their shareholder beneficiaries or trustees." *Walmart Real Est. Bus. Tr. v. Quarterfield Partners LLC*, 2025 WL 1577562, at *3 (4th Cir. June 4, 2025); *see Oak Plaza, LLC v. Buckingham*, DKC 22-0231, 2022 WL 1591404, at *6 (D. Md. May 19, 2022) ("Trust citizenship is a subject of continuing confusion."). The Supreme

Court has said that although an unincorporated entity sued in its own name takes the citizenship of all its members, "when a trustee files a lawsuit or is sued in her own name, her citizenship is all that matters for diversity purposes." *Americold Realty Trust v. ConAgra Foods, Inc.*, 577 U.S. 378, 383 (2016).

Applying *Americold*, "other courts of appeals have . . . found that the citizenship of a business trust is determined based on the citizenship of its members, while **the citizenship of a traditional trust is based on the citizenship of its trustee**." *Cartwright v. SSC Yanceyville Operating Company, LLC*, 2018 WL 6680925, at *4 (M.D.N.C. Dec. 19, 2018) (emphasis added) (citing *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 32, 39-41 (3d Cir. 2018); *Raymond Loubier Irrevocable Trust v. Loubier*, 858 F.3d 719, 722, 725-31 (2d Cir. 2017); *Wang v. New Mighty U.S. Trust*, 843 F.3d 487, 489-95 (D.C. Cir. 2016) (also defining traditional trust)). Under the rule adopted by these Circuits addressing the question post-*Americold*, the trust takes the citizenship of its trustees alone. Therefore, given that the Murrays are domiciled in Connecticut, the trust is a Connecticut citizen. Accordingly, at this stage, I am satisfied that Vineyard Vines is a citizen of the State of Connecticut.

The requisite amount in controversy for diversity jurisdiction is met in a class action if at least one of the named plaintiffs has a claim exceeding $75,000. *See, e.g., Rosmer v. Pfizer Inc.*, 263 F.3d 110, 122 (4th Cir. 2001). In a removal posture, the defendant need only allege the jurisdictional amount through a short and plain statement containing "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 88 (2014). "Generally, attorney's fees are not included in the amount-in-controversy calculation, but courts have created two exceptions to this rule: (1) If the fees are

provided for by contract; or (2) **if a statute mandates or allows payment of attorney's fees**." *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 368 (4th Cir. 2013) (citation omitted) (emphasis added).

Where, as here, the plaintiffs do not contest the amount in controversy, the Court need only satisfy itself that the defendant's allegations are plausible on the face of the pleadings and the notice of removal. *Maryland v. 3M Co.*, 130 F.4th 380, 387 (4th Cir. 2025), *cert. denied*, ___ U.S. ___, 2026 WL 568301 (Mar. 2, 2026). The relevant question "is not what the plaintiff will actually recover, but rather the amount that will be put at issue in the course of the litigation." *Ayers v. CIOX Health, LLC*, 735 F. Supp. 3d 607, 613 (D. Md. 2024) (internal quotation marks and citation omitted). As relevant here, the amount in controversy aggregates three components: (1) Actual and statutory damages; (2) attorney's fees where authorized by statute, *Francis*, 709 F.3d at 368; and (3) the value of any injunctive relief, measured either by its value to the plaintiff or the cost of compliance to the defendant. *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 639 (4th Cir. 2010).

Applying that framework, I am satisfied that the monetary threshold is met as to each named plaintiff. To be sure, plaintiffs' footnoted damages calculations identify only $19,500 for Carter, $22,000 for Nielsen, and $16,000 for Ayers in statutory damages tied to specifically enumerated emails. ECF 7 at 44 nn.1–3. But, the Complaint itself makes clear that those figures are underestimated. Each plaintiff alleges receipt of "at least" the enumerated emails; asserts that Vineyard Vines "commonly" sent three marketing emails per day; that plaintiffs continue to receive such emails; and that additional emails have been deleted and will be identified through discovery. ECF 7, ¶¶ 27, 58, 65, 72, 78. Should these allegations prove true, the statutory damages would exceed $75,000, as the threshold corresponds to just 150 unlawful emails per plaintiff at the statutory damages rate of $500 per email. In my view, these figures are plausibly supported by plaintiffs' allegations.

Further, the fee-shifting provisions of MCEMA § 14-3003 and Indiana Code § 24-5-22-10 place additional sums in controversy. Under the statutes, a defendant who is in violation is liable for attorney's fees. *See* C.L. § 14-3003(c) ("A person who violates this subtitle is liable for reasonable attorney's fees"); Ind. Code Ann. § 24-5-22-10 (providing that a prevailing plaintiff is entitled to "reasonable attorney's fees and other litigation costs reasonably incurred in connection with the action").

Moreover, plaintiffs' request for injunctive relief requiring Vineyard Vines to restructure the content of its marketing emails on a going-forward basis adds still further compliance costs to the calculation. *See* ECF 1 at 7. When a complaint seeks equitable relief, "the relevant inquiry is whether the direct pecuniary value of the right the plaintiff seeks to enforce, or the cost to the defendant of complying with any prospective equitable relief, exceeds $75,000." *Cossentino Contracting Co. v. CSX Transp., Inc.*, ABA-24-01883, 2024 WL 4644653, at *3 (D. Md. Oct. 30, 2024); *see JTH Tax, Inc.*, 624 F.3d at 639 (concluding that "the district court should have considered not only the amount of money damages [plaintiff] requested but also the injunctive relief it sought when determining jurisdiction").

Here, plaintiffs expressly seek an order enjoining VV from continuing to disseminate allegedly unlawful emails, pursuant to IDCEMA. ECF 7, ¶¶ 7, 83(g), Prayer for Relief ¶ F. Defendant contends that the injunction would presumably require Vineyard Vines to restructure its marketing-email program so that all terms and conditions applicable to every advertised sale are disclosed not only in the body of each email, as is allegedly the current practice, but also in the subject line itself. ECF 1 at 20–21. According to Vineyard Vines, compliance with such an injunction would entail meaningful operational changes, including the addition of compliance personnel to vet every marketing email going forward, and those compliance costs would "exceed

$75,000 in the *first year alone*", with additional costs accruing in subsequent years. *Id.* at 21 (emphasis in original). At this stage, that representation is plausible, and plaintiffs do not contend otherwise.

Notably, "[i]n many removal cases, a defendant's allegations rely to some extent on reasonable estimates, inferences, and deductions." *Scott v. Cricket Commc'ns, LLC,* 865 F.3d 189, 196 (4th Cir. 2017). Here, Vineyard Vines has plausibly demonstrated that diversity jurisdiction is proper. In aggregate, plaintiffs' statutory damages, attorney's fees, and injunctive relief plausibly exceed $75,000 as to each named plaintiff, and the amount-in-controversy requirement of § 1332(a)(1) is satisfied. Therefore, in my view, diversity jurisdiction under 28 U.S.C. § 1332(a)(1) is properly invoked, and removal on that basis was appropriate.

**2.**

In the alternative, defendant contends that the Court has original jurisdiction over this action pursuant to CAFA. ECF 1 at 22. Under CAFA, federal jurisdiction over a class action requires: (a) Minimal diversity, *i.e.*, that at least one class member be a citizen of a different state than any defendant; (b) an aggregate class of at least 100 members; and (c) an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2)(A), (d)(5)(B), (d)(6).

The first two requirements are satisfied. The named Maryland plaintiffs and the named Indiana plaintiff are citizens of states different from Vineyard Vines, a Connecticut citizen, as discussed above. And, plaintiffs allege that the Maryland and Indiana Classes consist of "at a minimum" fifty members each, therefore satisfying the 100 member minimum imposed by CAFA. ECF 7, ¶ 81.

13

I turn to the third requirement of CAFA jurisdiction, which is the amount in controversy. "In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(6). Of import, plaintiffs seek to certify classes that extend to "four years before the date of the filing of this complaint". ECF 7, ¶ 79.

Carter, a Maryland plaintiff, claims damages of $19,500 (ECF 7 at 44 n.1) for a period of approximately twenty months (*id.* ¶¶ 61(a)–(v)), which yields an average of $975 per month. Nielsen, who is also a Maryland plaintiff, claims $22,000 in statutory damages (*id.* at 44 n.2) over approximately eighteen months (*id.* ¶¶ 68(a)–(r)), which yields an average of $1,222 per month. *Id.* at 44 n.2. For Carter, projecting $975 across plaintiffs' desired four-year class period equates to $46,800 per class member. For Nielsen, this equates to $58,656 per class member across the four-year class period. These figures would require the Maryland Class to contain 107 and 86 members, respectively, to place more than $5,000,000 at issue.

Ayers, the sole Indiana plaintiff, claims damages of $16,000 (*id.* at 44 n.3) for a period of approximately eight months. *Id.* ¶¶ 75(a)–(n). These damages yield an average of $2,000 per month. Projecting $2,000 across plaintiffs' four-year class period equates to $96,000 per class member. Thus, the Indiana Class need contain only 53 members to place more than $5,000,000 in issue.

Plaintiffs allege that each class consists of "at a minimum" fifty members. ECF 7, ¶ 81. But, that figure is expressly identified as a floor and, given plaintiffs' allegations regarding the volume and frequency of VV's marketing emails over a four-year class period, it is plausible that the actual class sizes substantially exceed the modest thresholds (107, 86, and 53 members) needed to place more than $5,000,000 at issue.

As noted, the Complaint makes clear that the stated damages for the named plaintiffs are underinclusive, as plaintiffs "are not presently able to identify all the emails with false and misleading subject lines they have received." *Id.* ¶ 78. But, "discovery will show the full number of emails Vineyard Vines has sent throughout the relevant time period." *Id.* Further, defendant represents that "[i]n reality, the Maryland Class consists of significantly more than 107 putative class members" and "the Indiana Class consists of significantly more than 52 putative class members." ECF 1 at 27.

The Email Statutes also authorize attorney's fees. *See* C.L. § 14-3003(c); Ind. Code Ann. § 24-5-22-10. And, defendant maintains: "In class action lawsuits, '[a]ttorneys' fees awarded under the percentage of recovery method are generally between twenty-five (25) percent and thirty (30) percent of fund . . . .'" ECF 1 at 28 (quoting *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 684 (D. Md. 2013)). Applying even the lower end of this range to the statutory damages further inflates the amount at issue.

Based on the alleged volume of emails, the four-year class period, attorneys' fees, and defendant's representations, I am satisfied that the $5,000,000 minimum threshold under CAFA is met. In my view, defendant's representation that the aggregate amount in controversy exceeds $5,000,000 is plausible, and CAFA jurisdiction is established under § 1332(d)(2).

**3.**

As indicated, plaintiffs contend that a remand is necessary because they lack Article III standing. ECF 6 at 1.

To invoke the power of a federal court, a plaintiff must demonstrate that he or she has standing under Article III of the Constitution. *See Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017); *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011); *see also Frazier v. Prince George's*

15

*Cnty, Maryland*, 140 F.4th 556, 562 (4th Cir. 2025) ("The jurisdiction of federal courts is defined and limited by Article III of the Constitution.") (citations and internal quotation marks omitted). Indeed, "[i]t is axiomatic that the Article III standing requirements apply to all actions in the federal courts . . . ." *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011). Therefore, a "federal court cannot adjudicate a suit's merits without first ensuring it has subject matter jurisdiction . . . ." *ColonialWebb Contractors Co. v. Hill Phoenix, Inc.*, ___ F.4th ___, 2026 WL 1204647, at *3 (4th Cir. May 4, 2026); *see In re Trump*, 958 F.3d 274 (4th Cir. 2020) (en banc) ("The requirements for Article III standing are well established, and they apply in all cases regardless of the plaintiff or the particular theory of standing being asserted.") (Niemeyer, J., dissenting, joined by Wilkinson, Agee, Quattlebaum, and Rushing, JJ.), *vacated on other grounds sub nom. Trump v. D.C.*, 141 S.Ct. 1262 (2021).

Accordingly, whether a plaintiff has Article III standing is a threshold question in every federal case. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–102 (1998) (recognizing that standing to maintain suit implicates the court's jurisdiction to entertain suit and is thus a threshold question to be resolved before the merits); *Albert v. Lierman*, 152 F.4th 554, 559 (4th Cir. 2025) ("[S]tanding and ripeness are threshold jurisdictional issues to be decided before a court considers the merits of a case[.]"); *N. Virginia Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 488 (4th Cir. 2025) (describing standing as the "threshold question"); *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (same); *Beyond Systems, Inc. v. Kraft Foods, Inc.*, 777 F.3d 712, 715 (4th Cir. 2015) ("As an initial matter, we are bound to address the subject matter jurisdiction issue of whether [plaintiff] had Article III standing.").

It follows that a case may proceed in federal court only if a plaintiff's allegations satisfy the requirements of Article III, which reflect the "constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). If a plaintiff lacks Article III standing, the court lacks subject matter jurisdiction to hear the claim. *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458–59 (4th Cir. 2005). And, where the case has been removed from a state court, the court must remand the case to the state court if the plaintiff lacks standing. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). Indeed, "just as a district court must dismiss a case originally filed in federal court if it 'determines at any time that it lacks subject-matter jurisdiction,' Fed. R. Civ. P. 12(h)(3), it also must remand whenever it reaches the same conclusion about a case that was removed from state court, see 28 U.S.C. § 1447(c)." *ColonialWebb Contractors Co.*, 2026 WL 1204647, at *3; *see Davis v. First Nat'l Bank of Pennsylvania*, SAG-24-1575, 2024 WL 4007947, at *3 (D. Md. Aug. 30, 2024) ("Where a federal court finds a case that has been removed from state court . . . does not satisfy the requirements of Article III standing, it is obligated to remand that matter to state court.").

## C.

It is a bedrock principle that Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion*, 594 U.S. at 423. Indeed, "'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Spokeo*, 578 U.S. at 337 (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)); *see Murthy v. Missouri*, 603 U.S. 43, 56 (2024) ("Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"); *see also Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 295 (2022)

("The Constitution limits federal courts to deciding 'Cases' and 'Controversies.'") (quoting Art. III, § 2); *Carney v. Adams*, 592 U.S. 53, 58 (2020) (recognizing that Article III requires "a genuine, live dispute between adverse parties . . ."); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) ("Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'"); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (It is fundamental that Article III of the Federal Constitution confines the federal courts to adjudicating "actual, ongoing cases or controversies."); *Opiotennione v. Bozzuto Mgmt. Co.*, 130 F.4th 149, 153 (4th Cir. 2025) ("Article III of the constitution limits the judicial power of the United States to 'Cases' and 'Controversies.'"); *Laufer*, 60 F.4th at 161 (same).

A "case or controversy exists only when at least one plaintiff" establishes standing to sue. *Murthy*, 603 U.S. at 57 (citing *Raines*, 521 U.S. at 818). Notably, "the doctrine of standing [serves] as a means to implement" the case or controversy requirement. *Laufer*, 60 F.4th at 161; *see TransUnion*, 594 U.S. at 423 ("For there to be a case or controversy under Article III, the plaintiff must have . . . standing."); *Spokeo*, 578 U.S. at 338 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *Raines*, 521 U.S. at 818 ("One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue). "The standing inquiry asks whether a plaintiff ha[s] the requisite stake in the outcome of a case . . . ." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018).

Federal courts "do not adjudicate hypothetical or abstract disputes." *TransUnion*, 594 U.S. at 423. Nor do the courts "exercise general legal oversight" of other government branches, *id.*, or render "advisory opinions." *Id.* at 424. "Federal courts can only review statutes and executive actions when necessary 'to redress or prevent actual or imminently threatened injury to persons

18

caused by . . . official violation of law.'"  *Murthy*, 603 U.S. at 56 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 492 (2009)).

A federal court may resolve only "a real controversy with real impact on real persons . . . ." *American Legion v. American Humanist Assn.*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring in judgment).  When there is no case or controversy, "the court's subject matter jurisdiction ceases to exist . . . . " *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).  In the absence of a case or controversy, "the courts have no business deciding [the case] . . . ." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

"Continued adherence to the case-or-controversy requirement of Article III maintains the public's confidence in an unelected but restrained Federal Judiciary . . . .  For the federal courts to decide questions of law arising outside of cases and controversies would be inimical to the Constitution's democratic character." *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125, 133 (2011); *see DaimlerChrysler Corp.,* 547 U.S. at 341 ("[T]he constitutional limitation of federal-court jurisdiction to actual cases or controversies" is "fundamental to the judiciary's proper role in our system of government[.]").

To establish standing under Article III of the Constitution, a plaintiff must satisfy three well established elements: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423 (citing *Lujan*, 504 U.S. at 560–561); *see Food and Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *Cruz*, 596 U.S. at 296; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014);

*Clapper*, 568 U.S. at 409; *Poppleton Now Cmty. Ass'n, Inc. v. La Cite Dev., LLC*, ___ F.4th ___, 2026 WL 1204639, at *3 (4th Cir. May 4, 2026); *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 420 (4th Cir. 2025); *Delmarva Fisheries Ass'n, Inc. v. Atl. States Marine Fisheries Comm'n,* 127 F.4th 509, 515 (4th Cir. 2025); *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024); *Laufer*, 60 F.4th at 161; *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015). Requiring a plaintiff to demonstrate these three elements "ensures that federal courts decide only 'the rights of individuals,' and that federal courts exercise 'their proper function in a limited and separated government.'" *TransUnion*, 594 U.S. at 423 (citations omitted).

At the pleading stage, to establish standing, a plaintiff must "'clearly allege facts demonstrating'" an injury in fact. *Opiotennione*, 130 F.4th at 153 (citation omitted). Moreover, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *see TransUnion*, 594 U.S. at 431 (Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)"); *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (4th Cir. 2022) (same); *see also MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 103 (4th Cir. 2025); *Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 997 F.3d 149, 154 (4th Cir. 2021).

When standing is challenged on the pleadings, "a court 'accept[s] as valid the merits of [the plaintiff's] legal claims.'" *Laufer*, 60 F.4th at 161 (quoting *Cruz*, 596 U.S. at 298) (alterations in *Laufer*); *see Deal*, 911 F.3d at 187 (stating that the court accepts "'as true all material allegations of the complaint and construe[s] the complaint in favor of the complaining party.'") (citation

20

omitted); *see also Button v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018).  However, a district court "may conduct an evidentiary hearing." *Laufer*, 60 F.4th at 161.

The strictures of Article III standing apply with no less force in the context of class actions. Although "[e]very class member must have Article III standing in order to recover individual damages," *TransUnion*, 594 U.S. at 431, the Fourth Circuit has analyzed standing in the early stages of a class action "based on the allegations of personal injury made by the named plaintiffs." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (internal quotation marks omitted).

The dispute here focuses on the "'[f]irst and foremost' of standing's three elements": Injury in fact.  *Spokeo*, 578 U.S. at 338 (citing *Steel Co.*, 523 U.S. at 103); *see Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 368 (4th Cir. 2026) (en banc) ("*AFSCME*").  "[A]n injury in fact is 'an invasion of a legally protected interest' which is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Opiotennione*, 130 F.4th at 153 (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (requiring the plaintiff to allege a "concrete, particularized, and actual or imminent" injury).  Therefore, under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a personal, particularized injury." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013).

"Concreteness and particularity are two different requirements . . . ." *Opiotennione*, 130 F.4th at 153.  "[A]n injury is 'particularized' if it 'affect[s] the plaintiff in a personal and individual way.'" *Id.* (quoting *Spokeo*, 578 U.S. at 339) (second alteration in *Opiotennione*; internal quotation marks omitted); *see Food and Drug Admin.*, 602 U.S. at 381.  A concrete injury is one that is

"'real, and not abstract.'"  *TransUnion*, 594 U.S. at 424 (citation omitted); *see Food and Drug Admin.*, 602 U.S. at 381; *Holmes*, 156 F.4th at 421.

"'[F]inancial harm is a classic and paradigmatic form of injury in fact.'"  *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) (quoting *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018)).   But, "[v]arious intangible harms can also be concrete." *TransUnion,* 594 U.S. at 425; *see Baehr,* 953 F.3d at 252.   The Supreme Court has said, *TransUnion*, 594 U.S. at 425: "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.  Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." (citing, *inter alia*, *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008) (disclosure of private information); *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (intrusion upon seclusion), *cert. denied*, 141 S.Ct. 2552 (2021)); *see also Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019) ("Intrusions upon personal privacy were recognized in tort law and redressable through private litigation.").

Of import, the existence of an applicable statute that authorizes legal action under certain circumstances does not automatically create standing.  In other words, "plaintiffs cannot establish a cognizable injury simply by pleading a statutory violation."  *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921 (4th Cir. 2022); *see Raines*, 521 U.S. at 820 n.3 ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").

Notably, "an injury in law is not an injury in fact."  *TransUnion*, 594 U.S. at 427; *see AFSCME*, 172 F.4th at 368.  Congress "may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'"  *Spokeo*, 578 U.S. at 341

22

(alteration in *Spokeo*) (citation omitted).  To be sure, Congress is "well positioned to identify intangible harms that meet minimum Article III requirements," so "its judgment is . . . instructive and important." *Id.*  However, as  the Supreme Court said in *Spokeo*, 578 U.S. at 341: "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation."  Put another way, "Congress's determination that a cause of action exists does not displace [the] 'irreducible constitutional minimum' of standing."  *Krakauer*, 925 F.3d at 652 (citation omitted); *see id.* at 653 ("Private litigation, even if authorized by statute to serve a range of public ends, must vindicate the plaintiffs' interests, rather than serve solely [as] a vehicle for ensuring legal compliance.").

In *TransUnion*, 594 U.S. at 417, the Supreme Court said: "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms . . . ." (quoting *Spokeo*, 578 U. S. at 340–41).  Although there need not be "an exact duplicate in American history and tradition," a federal court is not entitled to "loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *TransUnion*, 594 U.S. at 424–25.

An injury in fact must also be actual or imminent.  The concepts of actual, ongoing injury or imminent injury are "disjunctive." *Deal*, 911 F.3d at 189.  Ongoing injuries are, "by definition, actual injuries for purposes of Article III standing." *Id.*  The imminence requirement is a "'somewhat elastic concept.'" *Clapper*, 568 U.S. at 409 (citation omitted).  Its "'purpose'" is "'to

ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.'"  *Id.* (citation omitted) (emphasis in *Clapper*).

A threatened injury can also satisfy Article III standing.  *Beck*, 848 F.3d at 271; *see South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019).  However, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient."  *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis and second alteration in *Clapper*).  Thus, "to establish Article III injury, a plaintiff must plead and prove that it has suffered (or will imminently suffer, absent a court's intervention) a concrete injury."  *AFSCME*, 172 F.4th at 368.

### III. Discussion

### A.

### 1.

Plaintiffs argue that this Court lacks subject matter jurisdiction because plaintiffs "have not alleged facts sufficient" to establish Article III standing.  ECF 6 at 1.  In their view, they have merely alleged a bare statutory violation, which does not constitute a concrete injury for the purpose of Article III standing.  *Id.* at 4–5 (citing *Spokeo*, 578 U.S. 330; *TransUnion*, 594 U.S. 413).  Nonetheless, plaintiffs maintain that their claims "are valid and viable ***in state court***[.]"  *Id.* (emphasis in original).

Plaintiffs observe: "There is no tort at common law allowing a plaintiff to recover for a bare misrepresentation or false statement, without reliance and resulting damages."  ECF 6 at 7.  Because plaintiffs have not alleged that they relied on the emails' deceptive subject lines, made any purchase as a result, experienced any financial harm, or suffered any concrete consequence,

beyond receipt of the emails, they maintain that their claims cannot proceed in federal court and must be remanded to state court.  ECF 6 at 9–10.

The Company advances several bases for standing.  ECF 30.  First, Vineyard Vines contends that plaintiffs' alleged receipt of voluminous, deceptive marketing emails is itself a cognizable injury-in-fact, because it is "the precise type of harm that the Maryland and Indiana legislatures sought to prevent when they enacted MCEMA and IDCEMA—specifically, 'the dissemination of false or misleading information through unsolicited, commercial e-mail.'"  *Id.* at 8 (quoting *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 16, 878 A.2d 567, 576 (2005) (emphasis added by defendant)).  That legislative judgment, defendant argues, combined with the common law torts of fraud and nuisance, which address harms similar in kind to those plaintiffs allegedly experienced, establishes the close relationship to a traditionally recognized harm that Article III requires.  ECF 30 at 7–16.  In particular, the Company relies on a series of California decisions under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, which, in its view, "reinforce the conclusion that Plaintiffs' alleged injuries have a common law analogue and, therefore, suffice to confer Article III standing."  ECF 30 at 23.

Second, defendant argues that the Complaint pleads a substantial risk of future harm.  Specifically, defendant contends that plaintiffs or other putative class members risk making improvident purchases absent an injunction.  *Id.* at 16–18.  In its view, this establishes standing.  *Id.* at 16.

Third, defendant contends that, even if plaintiffs lack standing, remand should be denied because plaintiffs' claims are preempted by the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, 15 U.S.C. § 7701 *et seq.* ("CAN-SPAM").  ECF 30 at 27–28.  Therefore, defendant posits that remand would be futile.  *Id.* at 27.

In Reply, plaintiffs insist that defendant has fundamentally misread the Complaint, injecting allegations that are not there and ignoring the ones that are. ECF 41 at 1–5. They emphasize that the Complaint contains no allegation that the emails were unwanted; no allegation that plaintiffs were forced to spend time reviewing or deleting them; and no allegation that any named plaintiff made or faces an imminent risk of making an improvident purchase. *Id.* at 3–5. Further, plaintiffs contend that defendant's California authorities are inapposite because they arose under a statute that governs only *unsolicited* commercial email, whereas MCEMA and IDCEMA apply to solicited and unsolicited email alike. *Id.* at 15–19. And, plaintiffs aver that each named plaintiff consented to receive defendant's marketing emails by opening an account and making purchases. *Id.*

As to future harm, plaintiffs argue that none of the named plaintiffs has alleged an imminent, concrete risk of being deceived into making an improvident purchase, and that Carter and Nielsen cannot seek injunctive relief in any event because MCEMA does not provide for it. *Id.* at 20–23. Finally, plaintiffs argue that the futility exception to remand does not apply in the Fourth Circuit. *Id.* at 23–24. To the contrary, the Court must remand if jurisdiction is lacking. *Id.*

As noted, the party invoking federal jurisdiction bears the burden of establishing standing. *Lujan*, 504 U.S. at 561; *see Strawn*, 530 F.3d at 296 (the removing party "carries the burden of alleging in his notice of removal and, if challenged, demonstrating the court's jurisdiction over the matter"). As defendant acknowledges, this creates "the anomalous situation in which Defendant, the removing party, asserts Article III standing exists." ECF 30 at 6. If Vineyard Vines cannot demonstrate that plaintiffs have suffered a concrete injury within the meaning of Article III, the case must be remanded. *See* 28 U.S.C. § 1447(c).

26

**2.**

Plaintiffs maintain that they merely allege a "bare procedural violation" of the Email Statutes by defendant, which does not constitute a concrete injury. ECF 6 at 5 (citing *Spokeo*, 578 U.S. at 342). According to plaintiffs, the conduct of VV in sending emails containing deceptive information in the subject lines is insufficient to establish Article III standing. *Id.*

The Maryland Anti-Spam Statute, C.L. § 14-3002(b), prohibits dissemination of an email that contains "false or misleading information in the subject line that has the capacity, tendency, or effect of deceiving the recipient." Similarly, the Indiana Email Statute, Ind. Code Ann. § 24-5-22-7(b)(3), prohibits dissemination of an email that "contains false or misleading information in the subject line." The Email Statutes under which plaintiffs assert their claims do not require actual damages in order for a court to impose the $500 penalty. Rather, the injury requirement is met upon receipt of an email that violates the Email Statutes. *See* C.L. § 14-3003 (providing damages "in an amount equal to the greater of $500 or the recipient's actual damages"); Ind. Code Ann. § 24-5-22-10 (same). According to plaintiffs, "solely by virtue of sending those violative emails, Vineyard Vines is liable to Named Plaintiffs for the statutory damages set forth in the Email Statutes." ECF 6 at 9.

Vineyard Vines relies, *inter alia*, on *Beyond Systems,* 777 F.3d 712, to dispute plaintiffs' contention that a mere violation of the Email Statutes is insufficient to confer Article III standing. ECF 30 at 12. In *Beyond Systems*, 777 F.3d at 716, the Court reasoned that Article III standing existed because the plaintiff "claimed a harm, receiving spam e-mail, and Maryland and California law create an interest in being free from such harm."

Defendant also relies on *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999 (W.D. Wash. 2019). ECF 30 at 13. There, the court considered the Washington Commercial Electronic Mail

27

Act ("WCEMA"), an analog to the statutes at issue here. *Harbers*, 415 F. Supp. 3d at 1003. The court found that the receipt of deceptive emails was sufficient to establish Article III standing. *Id.* at 1012.

In *Harbers*, the court noted that the "Ninth Circuit has held that an alleged violation of a statutory provision that protects a substantive right is sufficient to establish concrete injury." *Id.* at 1005 (citing *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017)). The *Harbers* Court went on to conduct an analysis of the legislative history and purpose of WCEMA. *Harbers*, 415 F. Supp. 3d at 1008–11. It concluded that violations of that statute gave rise to injuries resembling "the type of harms remedied by nuisance or fraud actions," and constituted the precise harm the legislature sought to prevent. *Id.* at 1008. On that basis, the court held that the plaintiff's receipt of deceptive marketing emails with false or misleading subject lines was sufficient to confer Article III standing, "even absent additional allegations of harm." *Id.* at 1009.

Further, defendant relies on *Baehr*, 953 F.3d 244, to demonstrate that intangible injuries can constitute concrete harm if the type of harm suffered is "the specific harm Congress sought to prevent" when it enacted the particular statute. ECF 30 at 7, 8. In *Baehr*, 953 F.3d at 250-51, the plaintiffs alleged a statutory kickback violation under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, but conceded they had not been overcharged for the settlement services they received. The Fourth Circuit said: "Concrete injuries are not . . . limited to those injuries that result in tangible harm." *Id.* at 252.

The Court "recognize[d] that a plaintiff suffers a concrete injury if she shows the harm stemming from the 'defendant's statutory violation is the type of harm Congress sought to prevent when it enacted the statute.'" *Id.* at 253 (citing *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d

28

234, 240-41 (4th Cir. 2019)).  Nevertheless, it concluded that the *Baehr* plaintiffs lacked standing. *Baehr*, 953 F.3d at 254.  The Court reasoned that "the deprivation of impartial and fair competition between settlement services providers—untethered from any evidence that the deprivation thereof increased settlement costs—is not a concrete injury under RESPA" because it was not the specific type of harm that Congress sought to prevent when it enacted RESPA.  *Id.*

Of import, *Beyond Systems*, *Harbers*, and *Baehr* were decided before the Supreme Court's decision in *TransUnion*, 594 U.S. 413.  In *TransUnion,* a class of 8,185 individuals filed suit against TransUnion, a credit reporting agency, seeking damages for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*.  *Id.* at 417.  TransUnion compiled and sold consumer reports, containing personal and financial information, to banks, landlords, and car dealerships "that request information about the creditworthiness of individual consumers."  *Id.* at 419.  It also used a software product that compared names with individuals listed on the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").  *Id.*  In particular, OFAC maintains a list of "'specially designated nationals'" believed to pose a threat to America's national security, such as terrorists, drug traffickers, and other serious criminals.  *Id.*  Because it is generally unlawful to transact business with any person on the OFAC list, TransUnion created the "OFAC Name Screen Alert to help businesses avoid transacting with individuals on OFAC's list."  *Id.*

The system generated "many false positives," however, as many "law-abiding Americans happen to share a first and last name" with someone on OFAC's list.  *Id.* at 420.  The named plaintiff, Ramirez, was one of them. When he sought to buy a car at a dealership, his name was flagged as a "potential match" on the OFAC list.  *Id.*  As a result, the car dealership refused to sell the vehicle to him.  *Id.*  The plaintiffs filed suit, alleging that TransUnion "failed to use reasonable

procedures to ensure the accuracy of their credit files, as maintained internally by TransUnion." *Id.* at 417.[4]

As to 1,853 members of the class, such as Ramirez, "TransUnion provided misleading credit reports to third-party businesses." *Id.* at 417. But, the "internal credit files of the other 6,332 class members were *not* provided to third-party businesses . . . ." *Id.* (emphasis in *TransUnion*).

To determine whether the class members had standing to recover monetary damages, the Supreme Court assessed "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 424 (quoting *Spokeo, Inc.*, 578 U.S. at 341 (2016)). The Court had "no trouble" concluding that the 1,853 class members whose credit reports were published to third parties containing OFAC alerts that misleadingly labeled them as potential terrorists, drug traffickers, or serious criminals "suffered a concrete harm that qualifies as an injury in fact." *Id.* at 432. The Court reasoned that the publication to a third party of a credit report bearing a misleading OFAC alert shared a "'close relationship'" to the harm associated with the tort of defamation. *Id.* However, because the credit reports of the remaining 6,332 class members were never disseminated to third parties, they did not suffer concrete harm for purposes of Article III. *Id.* at 433.

The Court explained that "[p]ublication is 'essential to liability' in a suit for defamation." *Id.* at 434 (citation omitted). As the Court put it, *id.*: "[T]here is 'no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to

---

[4] Two other claims were lodged by all 8,185 class members. *TransUnion*, 594 U.S. at 418. In those claims, the plaintiffs alleged "formatting defects in certain mailings sent to them by TransUnion." *Id.* However, only the named plaintiff, Ramirez, demonstrated that the alleged formatting errors caused him any concrete harm. *Id.* Therefore, the Court determined that he was the only class member with Article III standing to pursue the formatting defect claims. *Id.*

concrete injury.'" (Citation omitted). Thus, "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.*

The class members advanced an additional contention based on "*risk of future harm.*" *Id.* at 435 (emphasis in *TransUnion*). They argued, *id.*: "[T]he existence of misleading OFAC alerts in their internal credit files exposed them to a material risk that the information would be disseminated in the future to third parties and thereby cause them harm." The Court rejected that argument as well. Nevertheless, it said, *id.*: "*[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring,* at least so long as the risk of harm is sufficiently imminent and substantial." (Emphasis added). The plaintiffs did not seek injunctive relief, however. And, they did not "factually establish a sufficient risk of future harm to support Article III standing." *Id.* at 437–38. Accordingly, the Court concluded that these class members did not have standing.

Of significance, in *TransUnion*, the Supreme Court made clear that a statutory violation is not coextensive with a concrete harm. *Id.* at 424–26. The Court said, *id.* at 426: "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III . . . ." Moreover, the Court stated that courts "cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so." *Id.* (citation omitted). Therefore, when a plaintiff suffers the precise type of harm that the legislature sought to prevent, this alone does not establish Article III standing.

Plaintiffs assert that the case of *Asabre v. Retail Servs. & Sys., Inc.,* PWG-22-148, 2022 WL 4326536 (D. Md. Sept. 19, 2022), provides critical guidance in a post-*TransUnion* world. ECF 6 at 2. There, Judge Grimm evaluated a motion to remand in a putative class action case

lodged pursuant to the MCEMA. *Asabre,* 2022 WL 4326536, at *1. Asabre "alleged that she received emails from Total Wine offering discounts on wine, but the discounts included conditions that were not disclosed in the subject heading of the email." *Id.* at *2. She sought statutory damages of $500 per violation and attorneys' fees. *Id.* Asabre's allegations were nearly identical to those of plaintiffs here. And, in *Asabre,* the defendant argued that "the bar for showing a concrete injury is low, and that Ms. Asabre's complaint alleges intangible injury" sufficient to establish Article III standing. *Id.*

The *Asabre* Court granted the motion to remand the case based on a lack of Article III standing. *Id.* It reasoned that plaintiff "does not assert an injury, not [sic] does she allege any facts to support a finding that she incurred an injury from her receipt of the challenged emails. Indeed, she specifically and expressly states that she alleges only a statutory violation." *Id.*

Judge Grimm also addressed *Beyond Systems*, explaining, *id*:

> *Beyond Systems* was decided prior to both *Spokeo* and *TransUnion*, which rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.' *TransUnion*, [594 U.S. at 414] (quoting *Spokeo*, 578 U.S. at 341). The Fourth Circuit court determined that Beyond Systems had claimed a harm—receiving spam e-mail, and Maryland law had created an interest in being free from such harm. *Beyond Systems*, 777 F.3d at 716. It did not discuss the plaintiff's alleged harms from receiving spam email, although it referred to the plaintiff having 'invited its own purported injury.' *Id.* at 715.[] The Supreme Court has since emphasized that courts must 'independently decide whether a plaintiff has suffered a concrete harm under Article III' and 'cannot treat an injury as concrete for Article III purposes based only on Congress's say-so.' *TransUnion*, [594 U.S. at 426] (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 999, n. 2 (11th Cir. 2020)). The Fourth Circuit has also subsequently emphasized this point. *Garey*, 35 F.4th at 921 ('[P]laintiffs cannot establish a cognizable injury simply by pleading a statutory violation.').

Vineyard Vines contends that the *Asabre* Court "likely erred," because "extensive authority establishes that, under *Spokeo* and *TransUnion*, a plaintiff's alleged inundation with voluminous deceptive marketing emails itself constitutes a cognizable injury-in-fact—'even absent additional

32

allegations of harm.'"   ECF 30 at 26 (quoting *Harbers*, 415 F. Supp. 3d at 1009-11).[5]   The

Company argues that *Asabre* "does not establish a convincing basis to stray from the foregoing

extensive and well-reasoned authority."  ECF 30 at 25.  It posits, *id.* at 26:

> Here, by contrast, each Plaintiff alleges that they have been inundated with—and
> continue to be inundated with—voluminous deceptive emails; that they have
> needed to delete a considerable number of these; that a substantial risk exists that
> they or putative class members will make an improvident purchase as a result; and
> that the ongoing nuisance caused thereby is so severe that an injunction banning
> Defendant's alleged practice is required. These important factual distinctions
> compel a different legal result here than in *Asabre*.

Defendant's attempt to distinguish *Asabre* rests on injuries defendant has invented, not

injuries plaintiffs have alleged.  For example, plaintiffs have not alleged that they were "inundated"

with defendant's emails, so as to be forced to expend time reviewing or deleting them.  Nor do

plaintiffs allege that they ever made a single "improvident purchase" because of the deceptive

emails. Rather, plaintiffs assert that VV's conduct violates statutory prohibitions.   The lone

reference to "deleting" in the Complaint appears to explain that because plaintiffs deleted some

emails, they cannot presently identify all of defendant's offending emails.  *See* ECF 7, ¶ 78.

Moreover, *Asabre* is not an outlier to be explained away, as defendant would have it.  At

the time the parties completed briefing of the Remand Motion, it was the only opinion decided

after *TransUnion* from this district to address Article III standing in the context of an alleged

MCEMA violation.  Since then, in *Mulanena v. Ulta Salon, Cosmetics & Fragrance, Inc.*, JRR-

25-3753, 2026 WL 1214932 (D. Md. May 4, 2026), a case materially similar to this one, Judge

Rubin granted plaintiffs' motion to remand.

---

[5] Vineyard Vines also contends that "*Asabre's* persuasive force is further diminished because the court did not perform the rigorous analysis the Supreme Court mandated in *Spokeo* and *TransUnion*."  ECF 30 at 27.  But, the *Asabre* Court said: "I need not engage in further detailed analysis regarding whether the plaintiff has established a cognizable injury by identifying a historical analogue for her asserted injury.[]"  *Asabre,* 2022 WL 4326536, at *2.

In *Mulanena*, the plaintiffs brought a putative class action under MCEMA, premised on alleged false or misleading email subject lines; the defendant removed under diversity and CAFA; and the plaintiffs moved to remand for lack of Article III standing. *Id.* at *1. Ulta Salon, like Vineyard Vines, relied on *Baehr*, 953 F.3d 244; *Beyond Systems, Inc.*, 777 F.3d 712; and *Harbers*, 415 F. Supp. 999, to argue that "because the harm alleged in Plaintiffs' 'Complaint is the precise type of concrete harm that the Maryland legislature sought to prevent in enacting MCEMA, it amounts to a cognizable injury-in-fact.'" *Mulanena*, 2026 WL 1214932, at *4 (citation omitted). Further, defendant opposed remand by arguing that plaintiffs' alleged receipt of deceptive commercial emails bore a "close relationship" to the common-law harms of nuisance, fraud, and intrusion upon seclusion. *Id.* Judge Rubin rejected defendant's arguments and granted the motion to remand, finding that "there are no alleged facts to support a finding that Plaintiffs suffered a concrete injury from their receipt of Defendant's emails" and that the defendant therefore "cannot demonstrate that Plaintiffs have Article III standing." *Id.* at *7.

Defendant fares no better with its broad legal argument, to the effect that mere receipt of deceptive emails constitutes a cognizable injury because it is the particular harm that the legislatures in Maryland and Indiana sought to prevent. It may be true that the legislatures intended to prevent individuals from being subjected to the kind of emails in issue. But, that circumstance is not dispositive as to whether plaintiffs have suffered a cognizable injury-in-fact under Article III. The *TransUnion* Court was clear, stating: "For standing purposes . . . an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *TransUnion*, 594 U.S. at 426–27.

34

The Fourth Circuit has also been clear.  It has said: "The intangible harm of enduring a statutory violation, standing alone, typically won't suffice under Article III—unless there's separate harm (or a materially increased risk of another harm) associated with the violation." *O'Leary v. TrustedID, Inc.,* 60 F.4th 240, 243 (4th Cir. 2023).

**3.**

Under *TransUnion*, 594 U.S. at 417, an intangible harm may still be concrete if it bears a 'close relationship' to a harm traditionally recognized at common law.  I next consider whether, on this basis, plaintiffs have alleged facts sufficient to satisfy the element of concrete harm.

Defendant argues that, even if a statutory violation alone does not suffice, more is alleged here; the conduct in issue bears a close relationship to the common law torts of fraud and nuisance. ECF 30 at 4.  According to defendant, "Plaintiffs' insistence that they seek statutory damages only is legally irrelevant" (*id.* at 20), because plaintiffs' alleged injuries "constitute the '***types*** of harm protected at common law'" by the torts of fraud and nuisance.  *Id.* at 22 (quoting *Krakauer,* 925 F.3d at 654 (emphasis added by defendant)).

Moreover, Vineyard Vines contends that the TCPA, 47 U.S.C. § 227, "closely resembles" the Email Statutes "because the TCPA prohibits junk faxes and unsolicited advertising calls."  ECF 30 at 23 (citations and internal quotations omitted; cleaned up).  In its view, cases under the TCPA "reinforce the conclusion that Plaintiffs' alleged injuries have a common law analogue and, therefore, suffice to confer Article III standing."  *Id.*  Although defendant frames its analog argument in terms of fraud and nuisance, some of the cases on which defendant relies involve the torts of intrusion upon seclusion and invasion of privacy.

**a.**

To establish standing, defendant relies on a host of California cases, many of which were decided after *TransUnion,* in which courts found Article III standing in the context of alleged violations of California's anti-spam statute, Cal. Bus. & Prof. Code § 17529.5. *See* ECF 30 at 23-25. Each of these decisions, as well as Fourth Circuit jurisprudence, to which I turn first, bases Article III standing on an analogy between unsolicited commercial emails and the common-law torts of intrusion upon seclusion, invasion of privacy, and nuisance, drawing on precedent under the TCPA, 47 U.S.C. § 227.[6]

Congress enacted the TCPA in 1991 to address what it identified as the growing problem of unsolicited telemarketing. The statute restricts certain categories of unwanted telephonic communications, including automated calls and prerecorded messages to residential and cellular lines, calls to numbers listed on the national Do-Not-Call registry, and unsolicited fax advertisements. *See* 47 U.S.C. § 227(b), (c). It also creates a private right of action, permitting recipients to recover statutory damages of $500 per violation, trebled for willful or knowing conduct. *Id.* § 227(b)(3), (c)(5). Because the TCPA targets communications the recipient did not invite, courts, including the Fourth Circuit, have repeatedly concluded that statutory violations bear a close relationship to the common-law privacy torts of intrusion upon seclusion and invasion of privacy, and therefore satisfy Article III's concreteness requirement. *See, e.g.*, *Krakauer*, 925 F.3d at 653; *Van Patten*, 847 F.3d at 1043; *Gadelhak*, 950 F.3d at 462.

---

[6] In *AFSCME*, 172 F.4th at 369, the Court defined the tort of intrusion on seclusion as "an 'intentional[] intru[sion], physical[] or otherwise, upon the solitude or seclusion of another or his private affairs or concerns' that 'would be highly offensive to a reasonable person.'" (quoting RESTATEMENT (SECOND) OF TORTS § 652B (A.L.I. 1977)) (alterations in *AFSCME*).

The Company invokes *Krakauer,* 925 F.3d 643, for the proposition that plaintiffs' alleged injuries "constitute the 'types of harms protected at common law.'"  ECF 30 at 22 (quoting *Krakauer*, 925 F.3d at 654).  In *Krakauer*, 925 F.3d at 648, the plaintiffs filed a class action lawsuit, alleging that the defendant's sales representatives "routinely flouted" the TCPA.  The Court noted that, pursuant to the TCPA, to "bring suit, the plaintiffs here must have received *unwanted* calls on multiple occasions."  *Id.* at 653 (emphasis in *Krakauer*).  Moreover, "[t]he statute requires that an individual receive a call on his own residential number, a call that he previously took steps to avoid."  *Id.*  The Fourth Circuit concluded that the private right of action under the TCPA "plainly satisfies the demands of Article III."  *Id.* at 653.  It said, *id.*: "Our legal traditions . . . have long protected privacy interests in the home."  Citing the Second Restatement of Torts, the Court also said: "Intrusions upon personal privacy were recognized in tort law and redressable through private litigation."  *Id.*

The Fourth Circuit has applied the same privacy-analog framework outside the TCPA context, in cases addressing statutes that protect against non-consensual disclosure or acquisition of personal information.  *See Garey*, 35 F.4th at 921–22; *O'Leary*, 60 F.4th at 245–46.  Those decisions establish that the analog turns on whether the alleged invasion was non-consensual.  If it was non-consensual, standing follows.  But, if it was consensual, the asserted injury is too abstract to satisfy Article III.

In *O'Leary*, 60 F.4th 240, the Fourth Circuit considered whether the plaintiff, Brady O'Leary, had standing to bring suit under South Carolina's Financial Identity Fraud and Identity Theft Protection Act, S.C. Code Ann. § 37-20-180 ("SC Act").  *Id.* at 241.  The SC Act prohibited "'requir[ing] a consumer to use his social security number or a portion of it containing six digits or more to access an Internet web site, unless a password or unique personal identification number

or other authentication device is also required to access the Internet web site.'"  *Id.* (citation omitted; alteration in *O'Leary*).

Equifax, a nonparty to the case, was subject to a data breach.  *Id.*  Equifax engaged its subsidiary, defendant TrustedID, Inc., "to use TrustedID's website to inform customers whether they were impacted by the data breach."  *Id.*  The plaintiff visited TrustedID's website to learn whether his data had been compromised.  *Id.*  The website required O'Leary to enter his six-digit SSN, but it did not use "any other safety precautions."  *Id.*  After entering his SSN, O'Leary was informed that he was not impacted by Equifax's data breach.  *Id.*  But, he alleged that TrustedID "shared the six digits of his SSN with Equifax."  *Id.*

O'Leary sued TrustedID, "alleging that TrustedID's practice of requiring six digits of consumers' SSNs violated the [SC] Act and South Carolina's common-law right to privacy."  *Id.* at 241.  He later added a claim of negligence.  *Id.*  The plaintiff "said he was injured when TrustedID 'intentionally [took] personal identifying information and monetiz[ed] it in some way.'"  *Id.* at 242 (citation omitted; alterations in *O'Leary*).  TrustedID moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6).  *Id.*  TrustedID referred to the alleged injury as "'an invasion of privacy or intrusion upon seclusion.'"  *Id.* (citation omitted).

The district court determined that O'Leary had alleged "'an intangible concrete *harm* in the manner of an invasion of privacy,' which the court said was 'enough to give [it] subject-matter jurisdiction at this early stage of the case.'"  *Id.* (citations omitted; alteration and emphasis in *O'Leary*).  Accordingly, the district court determined that the plaintiff had standing.  Nevertheless, the court dismissed the plaintiff's claims pursuant to Rule 12(b)(6), and the plaintiff appealed.  *Id.*

The Fourth Circuit concluded that the plaintiff "alleged only a bare statutory violation and no Article III injury."  *Id.*  The Court explained, *id.* at 243: "The intangible harm of enduring a

38

statutory violation, standing alone, typically won't suffice under Article III—unless there's separate harm (or a materially increased risk of another harm) associated with the violation." Extrapolating from cases involving the Fair and Accurate Credit Transactions Act ("FACTA"), 15 U.S.C. § 1681 *et seq.*, as well as data breach cases, the Fourth Circuit said, *id.* at 244: "Article III excludes plaintiffs who rely on an abstract statutory privacy injury unless it came with a nonspeculative increased risk of identity theft." But, O'Leary had not alleged, "even in a speculative or conclusory fashion," that "entering six digits of his SSN on TrustedID's website has somehow raised his risk of identity theft." *Id.* Rather, "O'Leary relie[d] entirely on a mere procedural violation of a statute, which Article III rejects." *Id.* at 245.

According to the Court, O'Leary had not alleged "an injury with a 'close relationship' to a traditional or common-law analog", because "he appears to rely on some abstract privacy interest in his SSN itself." *Id.* (citation omitted). The Court considered two traditional analogs for intangible harms that confer standing: intrusion upon seclusion and disclosure of private information. *Id.* at 245–46.

The Court defined intrusion upon seclusion as a cause of action "'against defendants who invade[ ] the private solitude of another.'" *Id.* at 245 n.2 (quoting *Gadelhak*, 950 F.3d at 462). It acknowledged that in *TransUnion* the Supreme Court "mention[ed] intrusion upon seclusion as a traditionally recognized harm that provides a basis for lawsuits in federal court." *O'Leary*, 60 F.4th at 245 (citing *TransUnion*, 594 U.S. at 425). It also noted that *TransUnion* cited "as an example [] then-Judge Barrett's holding in *Gadelhak* that receiving unwanted text messages (which violated the Telephone Consumer Protection Act of 1991) could be a concrete injury in fact, as it closely relates to intrusion upon seclusion." *Id.* at 245 (citing *Gadelhak*, 950 F.3d at 462). And, the Fourth Circuit acknowledged that it, too, had recognized that "violations involving

unwanted calls" under the TCPA "are concrete injuries in fact, based on federal courts' traditional protection of 'privacy interests in the home.'" *O'Leary*, 60 F.4th at 245 (quoting *Krakauer*, 925 F.3d at 653).

Yet, the Court determined that O'Leary's alleged injury did not bear a close relationship to intrusion upon seclusion. *O'Leary*, 60 F.4th at 245. *O'Leary* involved what the Fourth Circuit characterized as an "abstract privacy interest in [a partial] SSN . . . ." *Id.* The *O'Leary* Court concluded, *id.* at 246: "O'Leary hasn't adequately pled that he was injured by the alleged statutory violation at all—much less in a way that closely relates to a traditional analog for a federal lawsuit."

*Garey*, 35 F.4th 917 is also instructive. There, the Fourth Circuit considered whether plaintiffs had standing to sue for an alleged violation of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq*. The DPPA provides a private cause of action against "'[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record,' for an impermissible purpose." *Id.* at 920 (citing 18 U.S.C. § 2724(a)). The defendants, personal injury lawyers, obtained motor vehicle accident reports from North Carolina law enforcement agencies or "private data brokers," *id.* at 919, which contained names and home addresses of the drivers. *Id.* at 919–20. The defendants used the personal information in the reports "to mail unsolicited attorney advertising materials to the drivers involved in those crashes." *Id.* at 920; *see also id.* at 919.

The *Garey* Court determined that plaintiffs' allegation that their "privacy [was] invaded by Defendants' knowingly obtaining his or her name and address from a motor vehicle record for an impermissible purpose in violation of law" constituted a "legally cognizable privacy injury." *Id.* at 922. It reasoned that the alleged harm was "closely related to the invasion of privacy, which

40

has long provided a basis for recovery at common law." *Id.* at 921.  Therefore, the Fourth Circuit concluded that the plaintiffs satisfied Article III.  *Id.* at 922.

In *AFSCME*, 172 F.4th 361, the en banc majority concluded that the disclosure by the Social Security Administration of the personally identifiable information of plaintiffs' members to the Department of Government Efficiency ("DOGE") inflicted a harm that is a close analog to the common law tort of intrusion upon seclusion.  *Id.* at 368 (citing, *inter alia, TransUnion*, 594 U.S. at 424–25).  The Court explained: "The tort is not limited to entering someone's house or peering through their windows. Rather, it includes other form[s] of investigation or examination of private concerns, including opening someone's mail, going through their wallet, examining their bank account, or compelling [them] by a forged court order to permit an inspection of [their] personal documents."  *Id.* at 369 (internal quotation marks and citation omitted).  It continued, *id.*: "Much like rifling through someone's wallet, bank account, or personal documents, granting unauthorized and unwarranted access to a person's sensitive personal information is an intentional intrusion into 'private affairs or concerns.'"  And, it said, *id.*: "[T]he unjustified intrusion upon the plaintiff's privacy *is* the harm." (Emphasis in *AFSCME*).

Here, plaintiffs do not allege that the emails were entirely unsolicited.  To the contrary, plaintiffs voluntarily created accounts with Vineyard Vines and provided defendant with their email addresses.  Therefore, the privacy and intrusion-based rationales in the cases discussed above would not extend to the facts here.

Defendant relies principally on a line of district court decisions from California, applying that state's anti-spam statute, Cal. Bus. & Prof. Code § 17529.5.  These decisions have found Article III standing on the strength of the privacy and intrusion analog discussed earlier.  *See* ECF 30 at 23–25.

41

California's § 17529.5 is codified in Article 1.8 of the Business and Professions Code, titled "Restrictions on Unsolicited Commercial E-Mail Advertisers." Section 17529.1 defines an "Unsolicited commercial e-mail advertisement" as one where: (1) "The recipient has not provided direct consent to receive advertisements from the advertiser" and (2) "The recipient does not have a preexisting or current business relationship . . . with the advertiser promoting the lease, sale, rental, gift offer, or other disposition of any property, goods, services, or extension of credit."

The California statute applies only to unwanted communications. The California decisions cited by VV grounded Article III standing on an analogy to common-law privacy torts because § 17529.5 codifies a right to be free from unsolicited communications. *See, e.g.*, *Lynch*, 2021 WL 4453470, at *3 (analogizing § 17529.5 to the TCPA and reasoning that both statutes protect against "the unwanted intrusion and nuisance of unsolicited" communications).

In *Lynch*, 2021 WL 4453470, the court found standing based on a determination that Cal. Bus. & Prof. Code § 17529.5 "closely resembles the Telephone Consumer Protection Act ('TCPA'), which prohibits junk faxes and unsolicited advertising calls." *Id.* at *3. The *Lynch* Court explained, *id.*:

> The Ninth Circuit has expressly held that 'a violation of the TCPA is a concrete, *de facto* injury,' citing the fact that 'invasions of privacy, intrusion upon seclusion, and nuisance' are harms American courts have long recognized.[] *Van Patten*, 847 F.3d at 1043. In passing the TCPA, 'Congress sought to protect consumers from the unwanted intrusion and nuisance of unsolicited telemarketing phone calls and fax advertisements.' *Id.* So too, here, with the Legislature's passage of § 17529.5.

As with the federal cases discussed earlier, the California cases referenced by VV share an important factual distinction: The emails at issue in those cases were entirely unsolicited by the recipients. *See, e.g., Chin v. Evergreen Freedom Foundation*, 764 F. Supp. 3d 924, 934 (C.D. Cal. 2025) (alleging the receipt of unsolicited commercial emails, and finding that "Plaintiffs' allegations of Section 17529.5 statutory violations are injuries in fact sufficient to confer Article

42

III standing"); *Whittaker v. Tactical USA, LLC,* JAM-23-2914, 2024 WL 1855645, at *1 (E.D. Cal. Apr. 29, 2024) (alleging that plaintiffs received 500 "unsolicited commercial email advertisements . . . which they never directly consented to receive"); *Diaz v. One Techs., LLC*, GHW-21-8571, 2022 WL 72283, at *5 (C.D. Cal. Jan. 6, 2022) (alleging that defendant "sen[t] millions of unwanted and unlawful commercial email messages to recipients that did not give consent to receive them); *Lynch v. AML Network, Ltd.*, GHW-21-3574, 2021 WL 4453470, at *1 (C.D. Cal. Sept. 27, 2021) ("Defendant allegedly used these affiliates to send at least 1,017 unlawful Unsolicited Commercial Emails ('spams') to Plaintiffs . . . ."); *Durward v. One Technologies LLC*, GHW-19-6371, 2019 WL 4930229, at *8 (C.D. Cal. Oct. 3, 2019) ("Because Plaintiff has alleged that Defendants sent her unwanted and deceptive spam emails, in violation of Cal. Bus. & Prof. Code. § 17529.5(a), she has alleged sufficient injury to confer standing."); *Silverstein v. Keynetics, Inc.*, JAK-18-4100, 2018 WL 5795776, at *1 (C.D. Cal. Nov. 5, 2018) ("Plaintiff alleges that 73 unsolicited, commercial e-mail messages ('spam') were transmitted to him . . . .").

That premise is absent here. Plaintiffs do not allege that the emails from VV were unsolicited. Indeed, each named plaintiff chose to open a Vineyard Vines account, provided the Company with an email address, and made purchases through that account. ECF 7, ¶¶ 60, 67, 74. But, under the Email Statutes at issue here, plaintiffs allege in the Complaint that "it is irrelevant whether misleading commercial e-mails were solicited." *Id.* ¶ 17.

In contrast to Cal. Bus. & Prof. Code § 17529.5, the MCEMA and IDCEMA apply to both solicited and unsolicited emails. C.L. § 14-3002(b) prohibits false or misleading subject lines in any "commercial electronic mail message" sent to a Maryland resident, without limiting application to unsolicited messages. Similarly, Ind. Code Ann. § 24-5-22-7 applies to any

43

commercial email sent to an Indiana resident. *See* Ind. Code Ann. § 24-5-22-8 (separate provision addressing only "unsolicited commercial electronic mail"). Thus, the privacy rationale that anchors the California decisions cited by the Company does not encompass plaintiffs' allegations; those decisions do not provide support for a common law analog.

Defendant also references two cases from the State of Washington to support its position: *Harbers*, 415 F. Supp. 3d, 999, and *Brinton v. Vivint Inc.*, TMC-23-6105, 2024 WL 3688589 (W.D. Wash. Aug. 7, 2024). *See* ECF 30 at 14, 15, 19. As discussed, *Harbers* was decided after *Spokeo* but before *TransUnion*. There, the court found that the WCEMA was established to protect "a concrete interest . . . akin to a historical, common law interest" that "resemble[s] the type of harms remedied by nuisance or fraud actions." *Harbers*, 415 F. Supp. at 1008. The court concluded that the WCEMA's "false or misleading subject line provisions were designed to protect Ms. Harbers and other Washington residents from the nuisance of unwanted commercial e-mails", and therefore, "the underlying purpose of [the WCEMA] is sufficient to establish Article III standing, without alleging any additional harm." *Id.* at 1010.

In support of its finding of concrete harm, the *Harbers* Court said: "'The TCPA establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent. Congress identified unsolicited contact as a concrete harm, and gave consumers a means to redress this harm.'" *Id.* at 1008 (quoting *Van Patten*, 847 F.3d at 1043). Further, the court noted: "The legislative history of [the WCEMA] indicates that the statute was designed to address unwanted commercial e-mails by restricting the types of deceptive spam most likely to not be screened out by filtering systems." *Id.* at 1010.

Similarly, in *Brinton*, 2024 WL 3688589, at *3, the court found Article III standing where a plaintiff alleged violations of the WCEMA. The court noted: "In the context of unsolicited

telemarketing calls, the Ninth Circuit has recognized 'a common-law analog to privacy violations.'" *Id.* (quoting *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1117–18 (9th Cir. 2022)). Further, the *Brinton* Court stated, 2024 WL 3688589, at *3 (citations omitted):

> The detailed analysis of concrete injury under CEMA by this district in *Harbers* remains persuasive after *TransUnion.* The Washington, California, and Florida statutes at issue all recognize that the recipient of unsolicited emails suffers an injury, whether in the form of 'lost productivity and resources, annoyance, consumption of valuable digital storage space and financial costs,' in addition to the foundational injuries to privacy and freedom from nuisance.

Again, plaintiffs complain about misleading emails from defendant. But, they do not allege that the emails themselves were unsolicited. As indicated, plaintiffs created online accounts with the defendant and provided their email addresses to VV. Moreover, they assert in the Complaint that, under the Email Statutes, "it is irrelevant whether misleading commercial e-mails were solicited." ECF 7, ¶ 17. In other words, plaintiffs do not allege any invasion of personal privacy. To the contrary, they established Vineyard Vines accounts, provided their contact, billing, and shipping information, and made purchases through the company's website or stores. ECF 7, ¶¶ 58–60, 65–67, 72–74, 102, 121. Nowhere do they allege that all emails were unwanted or that they ever sought to stop receiving them.

Thus, the TCPA is not an analog here. A person who receives emails that he or she never agreed to receive has arguably had his/her digital privacy invaded in a way that perhaps resembles the common law torts of intrusion upon seclusion and private nuisance. *See Van Patten,* 847 F.3d at 1042–43 ("Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients"). But, critically, those communications were entirely unsolicited. In the cases cited by Vineyard Vines, the courts did not hold that standing exists even if emails were generally solicited. The unsolicited character of the communications

was central to the analysis.   Three recent district court cases cited by plaintiffs buttress this conclusion.  *See* ECF 51; ECF 59; ECF 61.

As discussed, *Mulanena*, 2026 WL 1214932, provides helpful guidance.  There, Judge Rubin found that *Harbers* was distinguishable, and intrusion-upon-seclusion analogies inapt, because the plaintiffs did "not allege that Defendant's emails are unsolicited or unwanted," nor that "they were actually deceived by Defendant's emails."  *Id.* at *6–7.  And, said the Court, "the mere receipt of misleading or false subject lines in emails does not, by itself, constitute an injury."  *Id.* at *6.  Therefore, the court said: "Plaintiffs do not allege, or seek recovery for, invasion of privacy or any similar injury to constitute a concrete harm."  *Id.* at *7 (internal quotation marks and citation omitted).  Judge Rubin concluded: "As there are no alleged facts to support a finding that Plaintiffs suffered a concrete injury from their receipt of Defendant's emails, Defendant cannot demonstrate that Plaintiffs have Article III standing."  *Id.* at *7 (citing *Asabre*, 2022 WL 4326536, at *2).

In reaching this decision, Judge Rubin relied on two recent decisions from federal courts in the State of Washington: *Montes v. Catalyst Brands LLC*, TOR-25-281, 2025 WL 3485827 (E.D. Wash. Dec. 4, 2025), and *Nuri v. True Religion Apparel*, LK-25-6980, 2026 WL 864886 (W.D. Wash. Mar. 30, 2026).

In *Montes*, 2025 WL 3485827, at *3, the court "decline[d] to follow" *Harbers* and *Van Patten* because the emails were not alleged to be unsolicited, and therefore analogizing a violation of the WCEMA to a violation of the TCPA was "not a fair comparison."  *Id*.  The court said, *id.* (emphasis added):

> This is not a violation of privacy because Plaintiff welcomed Defendants' marketing emails and even wishes to continue to receive Defendants' emails. Plaintiff does not allege that these emails were unsolicited or unwanted. They are not unsolicited messages.  This is not the same right in *Van Patten*. *Van Patten*, 847

46

F.3d at 1043.  It is not the same right that Plaintiff suggests is a substantive right and meets the requirement for concrete injury**. This is receipt of alleged misleading or false marketing email subject lines from a solicited company. There is not an invasion of privacy or any similar injury to constitute a concrete harm.** Regardless, the Supreme Court already made it clear that if there is no personal harm to Plaintiff, it does not meet the requirements for Article III standing. *TransUnion*[], 594 U.S. [at] 427-28. Therefore, there is not a concrete harm to confer standing.

Similarly, in *Nuri*, 2026 WL 864886, at *3, the court said: "Contrary to True Religion's arguments, Nuri's allegations do not closely resemble nuisance or otherwise establish Article III standing.[] There is no allegation that any of the relevant emails were unsolicited; to the contrary, Nuri provided her email address to True Religion and 'would like to continue receiving truthful information from True Religion regarding its products.'"  Therefore, the court remanded the case to state court.  *Id.* at *4.

### b.

Defendant asserts that plaintiffs' "claimed harm involves the same basic type of injury that common law fraud and nuisance actions are designed to prevent."  ECF 30 at 22.  Defendant reiterates that "each Plaintiff alleges that she has received—and continues to receive—voluminous deceptive and unwanted emails; that she has had to delete a considerable number of those emails; that an injunction is necessary to end this practice and the associated harm and nuisance; and that, absent an injunction, a real risk exists that Plaintiffs or putative class members will be duped into making an improvident purchase."  *Id.*

In my view, defendant's interpretation of the Complaint is unmoored from its plain text. Vineyard Vines repeatedly describes the emails at issue as "unwanted."  *See* ECF 30 at 9, 10, 14, 19, 22, 24.  But, in general, plaintiffs do not complain that the emails they received from defendant were unwanted.  In essence, plaintiffs allege that they consented to receive emails, in that each named plaintiff chose to establish an online account with Vineyard Vines; provided their respective

47

email addresses to Vineyard Vines; and receipt of emails from VV are part of the process. ECF 7, ¶¶ 60, 67, 74; *see also id.* ¶¶ 50, 51, 109, 129. Examining the Complaint as a whole, plaintiffs complain that the emails violated Maryland law and Indiana law, but plaintiffs do not allege that they suffered an actual injury, much less one that bears a close relationship to fraud or nuisance. Apart from defendant's comparisons to cases involving unsolicited emails, discussed above, defendant does not provide additional guidance as to how plaintiffs specifically have alleged the harm-defining elements of these torts.

To be sure, as to a proper analog, there need not be "an exact duplicate in American history and tradition." *TransUnion*, 594 U.S. at 424–25; *see also Salazar v. Paramount Glob.*, 133 F.4th 642, 647 (6th Cir. 2025) ("We are analyzing whether the asserted harm is sufficiently analogous to a traditional harm recognized by law—not whether the plaintiff has pleaded an element-by-element match to a historical tort."); *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 542 n.6 (2d Cir. 2024) (a plaintiff need not "plead *every* element of a common-law analog to satisfy the concreteness requirement.") (emphasis in *Salazar*); *Drazen v. Pinto*, 74 F.4th 1336, 1343 (11th Cir. 2023) (en banc) (explaining that a common law analog does "not require carbon copies").

Moreover, the proper focus is on the kind of harms protected at common law, not the degree of the harm. *See Krakauer*, 925 F.3d at 654 ("Our inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable."); *Gadelhak*, 950 F.3d at 462 ("But when *Spokeo* instructs us to analogize to harms recognized by the common law, we are meant to look for a 'close relationship' in kind, not degree."); *see also Ward v. NPAS, Inc.*, 63 F.4th 576, 580–81 (6th Cir. 2023) (focusing on the "kind" of harm protected by common law intrusion upon seclusion); *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822

(5th Cir. 2022) (courts should "focus[ ] on types of harms protected at common law, not the precise point at which those harms become actionable") (citation omitted).

However, the asserted harm must resemble not just the general category of wrong addressed by the "harm protected by a common-law cause of action." *Holmes*, 156 F.4th at 424. In *Holmes*, the Fourth Circuit said, *id.* at 426 (emphasis in *Holmes*):

> Recall that *TransUnion* only seeks a 'close relationship' between *harms*, not elements. 594 U.S. at 425. So the only elements that matter are the ones that define the harm of the analogous cause of action. A defendant's disclosure, though also *an* element of the public disclosure of private information tort, is not a *harm-defining* element—it goes to the defendant's liability, not to what is felt by the plaintiff.

Detrimental reliance is the harm-defining element of fraud. A plaintiff is injured not when the false statement is made, but when the plaintiff acts on it, to his or her detriment. *See, e.g.*, *Pruitt v. Resurgent Cap. Servs., LP*, 610 F. Supp. 3d 775, 781 (D. Md. 2022) (stating that "detrimental reliance is so central a feature of fraud and negligent misrepresentation that [the plaintiff] must at least show that she relied on the [misrepresentation] to her detriment in some way").

The harm-defining element of nuisance is substantial and unreasonable interference with the use and enjoyment of property. *See Poppleton Now Cmty. Ass'n, Inc.*, 2026 WL 1204639, at *3 ("Maryland law defines a private nuisance as 'a nontrespassory invasion of another's interest in the private use and enjoyment of land' that is "substantial and unreasonable."") (first quoting *Rosenblatt v. Exxon Co.*, 335 Md. 58, 80, 642 A.2d 180, 190 (1994), and then quoting *Gorman v. Sabo*, 210 Md. 155, 159, 122 A.2d 475, 477 (1956)); *Grande Vista, LLC v. United States*, 680 F. Supp. 3d 550, 566 (D. Md. 2023) ("A nuisance claim requires that a plaintiff 'establish an unreasonable and substantial interference with his or her use and enjoyment of his or her property, such that the injury is of such a character as to diminish materially the value of the

49

property as a dwelling . . . and seriously interfere with the ordinary comfort and enjoyment of it.'") (quoting *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 409, 71 A.3d 30, 94 (2013)). *Washington Suburban Sanitary Commission v. Cae-Link Corp.*, 330 Md. 115, 126, 622 A.2d 745, 750 (1993) ("To prove the existence of a nuisance . . . the complained of interference must cause actual physical discomfort and annoyance to those of ordinary sensibilities, tastes and habits . . . ; it must interfere seriously with the ordinary comfort and enjoyment of the property.").

In my view, plaintiffs have not asserted the harm-defining elements for either tort. With respect to fraud, they do not allege that they relied on the misleading subject lines, made any improvident purchases in response to the emails, or suffered any economic consequences from having received them. And, for nuisance, they have not alleged any substantial interference with enjoyment of their property. They allege only the receipt of emails they voluntarily agreed to receive when they opened accounts, provided their email addresses, and made purchases from Vineyard Vines.

For nuisance, defendant's arguments are unpersuasive with respect to cases in which courts found that receipt of deceptive emails conferred Article III standing, because those cases uniformly involved *unsolicited* communications that the plaintiffs never consented to receive and thus resembled the type of harm present in common law privacy torts. Accordingly, defendant cannot invoke the nuisance and privacy rationales from those cases. Defendant does not engage otherwise with how plaintiffs' allegations satisfy the harm-defining elements of fraud or nuisance under Maryland law. *See* ECF 30.

In sum, plaintiffs allege that they experienced a legal wrong, but not the kind of harm that fraud or nuisance is designed to remedy. Nor do they demonstrate the requisite "close relationship" between plaintiffs' injury and the common law torts of fraud and nuisance.

50

*TransUnion*, 594 U.S. at 414.  "The relationship between harms cannot be so loose as to serve as an open-ended invitation for federal courts to create new bases for standing divorced from history and tradition."  *Holmes*, 156 F.4th at 424 (cleaned up).

### 4.

Try as defendant might, standing may not be created through the "embellishing [of] otherwise deficient allegations."  *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 179 (4th Cir. 2013) (quoting *Whitmore*, 495 U.S. at 155–56).  Here, plaintiffs' allegations are insufficient to confer Article III standing.  As in *Crouse v. First Nat'l Bank of Pennsylvania*, SAG-24-1216, 2024 WL 4007931, at *2 (D. Md. Aug. 30, 2024), defendant "faces a challenging hurdle," because plaintiffs appear to have "crafted [their] Complaint to circumvent federal jurisdiction. Nowhere in the Complaint is any assertion that Plaintiff[s] or any person [they] seek[] to represent suffered any concrete injury."

As noted, to my knowledge *Asabre* and *Mulanena* are the only post-*TransUnion* decisions from this District to evaluate Article III standing in the context of alleged MCEMA violations.  In *Asabre*, Judge Grimm found that the plaintiff did not assert an injury, nor did she allege "any facts to support a finding that she incurred an injury from her receipt of the challenged emails."  *Asabre*, 2022 WL 4326536, at *2.  Likewise, in *Mulanena*, Judge Rubin reasoned that because "there are no alleged facts to support a finding that Plaintiffs suffered a concrete injury from their receipt of Defendant's emails, Defendant cannot demonstrate that Plaintiffs have Article III standing."  *Mulanena*, 2026 WL 1214932, at *7.  The same is true here.  And, like the court in *Montes*, 2025 WL 3485827, at *3, this "Court fails to see how receiving an email with a misleading or false subject line harmed Plaintiff in a concrete manner that would rise to the level required for

standing." To the contrary, this is precisely the type of "bare procedural violation" that, under *TransUnion* and *Spokeo*, does not confer Article III standing.

Nor have plaintiffs pled allegations sufficient to show that they "suffered a harm with a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424. Specifically, the Complaint contains no allegation of reliance, no allegation of a purchase influenced by the misleading subject lines, and no allegation of any other tangible or intangible harm beyond the fact of receiving emails with allegedly deceptive subject lines.

For the foregoing reasons, I conclude that mere receipt of emails with misleading or false subject lines does not, by itself, constitute a concrete injury sufficient to confer Article III standing.

**B.**

Defendant also contends that plaintiffs' allegations give rise to a substantial and imminent risk of future injury sufficient to confer Article III standing. ECF 30 at 16. Specifically, defendant contends that because Vineyard Vines continues to send marketing emails designed to "create[] a false sense of urgency" and stimulate consumers' "desire to get the deal before its gone" (ECF 7, ¶¶ 2, 24–25), there is a meaningful risk that plaintiffs or putative class members will be deceived into making improvident purchases unless an injunction is put in place. ECF 30 at 16–18. Further, defendant argues that plaintiffs' own demand for injunctive relief confirms they believe this risk is substantial and ongoing. *Id.* at 18 (citing *Ehrlich v. Perez*, 394 Md. 691, 733–34, 908 A.2d 1220, 1245 (2006) ("[I]njunctive relief is a preventive and protective remedy, aimed at future acts")).

To be sure, as defendant notes, plaintiffs seek an injunction "enjoining Vineyard Vines from sending the unlawful emails in the future." ECF 7 at 37.  But, in my view, defendant's future harm argument fails with regard to standing.

As a threshold matter, the MCEMA does not create a private right to injunctive relief; its remedial provision limits relief to statutory damages and attorneys' fees. *See* C.L. § 14-3003 (providing that "a recipient of a commercial electronic mail message that violates this subtitle may bring an action" to recover damages and fees, but not injunctive relief).  In contrast, the IDCEMA provides for equitable relief.  *See* Ind. Code Ann. § 24-5-22-10; ECF 7 at 37 (requesting injunctive relief "pursuant to Ind. Code Ann. § 24-5-22-10" only).  Consequently, any future-harm theory based on the threat of continued receipt of deceptive emails or improvident purchases must rest exclusively on the allegations of Ayers, and not on those of Carter and Nielsen.  *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("[S]tanding is not dispensed in gross.").  And, the Court "analyze[s] standing in the early stages of a class action 'based on the allegations of personal injury made by the named plaintiffs.'"  *Fernandez*, 116 F.4th at 295 (quoting *Baehr*, 953 F.3d at 252).

But, Ayers has not alleged the kind of concrete, imminent future harm that would confer standing to seek injunctive relief in federal court.  Article III standing to seek injunctive relief requires that a plaintiff demonstrate that he or she "is immediately in danger of sustaining some direct injury as the result of the challenged official conduct."  *Beck*, 848 F.3d at 277 (cleaned up).  "A future harm is not imminent just because there is an 'objectively reasonable likelihood' that it will someday come to pass."  *Holmes,* 156 F.4th at 429 (citation omitted).  Rather, a plaintiff must show a substantial risk that harm will occur "in the near future."  *Id.; see AFSCME*, 172 F.4th 361, 368 (4th Cir. 2026) ("Rather, to establish Article III injury, a plaintiff must plead and prove that it

has suffered (**or will imminently suffer**, absent a court's intervention) a concrete injury.") (citing *TransUnion*, 594 U.S. at 427) (emphasis added).

The Fourth Circuit's en banc decision in *AFSCME*, 172 F.4th 361, reinforces the point. There, although the Court majority found that plaintiffs had Article III standing in connection with the Social Security Administration's disclosure to DOGE of the sensitive personal information of plaintiffs' members, *id.* at 367–71, the Court's majority nonetheless vacated the preliminary injunction, reasoning that plaintiffs had not shown a substantial and imminent risk of future irreparable harm. *Id.* at 372–74. The Court underscored that "a preliminary injunction cannot reach back in time to prevent or undo irreparable harm that has already occurred," and stated that "the key question . . . is whether a preliminary injunction will prevent plaintiffs from suffering new or additional irreparable harm." *Id.* at 372. Thus, *AFSCME* illustrates that past injury, even where concrete enough to support Article III standing, does not establish the imminent future harm necessary to support prospective relief.

*Garey*, 35 F.4th 917, also provides guidance. The *Garey* Court determined that the group of plaintiffs seeking injunctive relief did not have standing because there was no evidence that they were subject to imminent or certainly impending harm. *Garey*, 35 F.4th at 923. The Court observed that a plaintiff can meet "'the injury-in-fact requirement for prospective relief' either by demonstrating 'a sufficiently imminent injury in fact' or by demonstrating 'an ongoing injury'. . . ." *Id.* at 922 (quoting, *inter alia*, *Deal*, 911 F.3d at 189). The Court agreed with the district court that plaintiffs did not show that they were "'subject to any imminent harm.'" *Id.* at 922. Specifically, because the plaintiffs "narrowed their case" to the unlawful "obtaining" of protected information, rather than using or disclosing, and the "obtaining of [plaintiffs'] personal information is a *fait* accompli," there was no "ongoing or imminent injury." *Id.* at 923. The Court

54

added that the "mere possibility" of a "future 'obtaining' violation cannot support injunctive relief. *Id.*; *see City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (stating that "past wrongs do not in themselves amount to that real and immediate threat of injury" needed for prospective relief).

Here, the Complaint's general allegations that Vineyard Vines's emails create a false sense of urgency and stimulate consumers to make purchases do not establish that any named plaintiff specifically faces an imminent risk of making an improvident purchase. *See Holmes,* 156 F.4th at 433 (stating that, "without alleging anything to support that [the plaintiff], specifically, had a substantial risk of suffering future harm, [the plaintiff] could not establish standing for prospective relief"). For example, the Complaint says nothing about Ayers's current shopping intentions, his susceptibility to Vineyard Vines's marketing tactics, or any particular likelihood that he will make a future purchase in reliance on a deceptive subject line.

But, even if I were to accept that the risk of future receipt of deceptive emails could constitute a future harm, that theory would still fail for the same reason that past receipt does not constitute concrete harm: The emails are essentially solicited. The possibility of receiving more emails with misleading subject lines is no more a cognizable future injury than the emails already received.

## C.

In a last-ditch argument, defendant contends, in the alternative, that even if this Court finds that plaintiffs lack Article III standing, the Court should deny the Remand Motion because remand would be futile. ECF 30 at 25–27. Defendant's futility theory rests on a preemption argument, contending that CAN-SPAM expressly preempts state statutes that "regulate[] the use of electronic mail to send commercial messages," 15 U.S.C. § 7707(b)(1), subject to a narrow exception for claims premised on "torts involving misrepresentations," *i.e.*, fraud and deceit. *Omega World*

*Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 354 (4th Cir. 2006). According to VV, because plaintiffs acknowledge that their claims lack allegations as to the elements of common law fraud, the claims fall outside the fraud-and-deceit exception to CAN-SPAM preemption. ECF 30 at 26–27. Therefore, according to defendant, plaintiffs' claims are doomed in any forum, and remanding them would waste judicial resources. *Id.* Both parties have submitted several Notices of Supplemental Authority that they assert support their positions on preemption. *See* ECF 52; ECF 53; ECF 55; ECF 56; ECF 60.

In my view, defendant's argument fails at the threshold. In *Roach v. West Virginia Regional Jail & Correctional Facility Authority*, 74 F.3d 46, 49 (4th Cir. 1996), the Fourth Circuit made clear that "the futility of a remand to . . . state court does not provide an exception to the plain meaning of" 28 U.S.C. § 1447(c). More recently, in *Wells*, 150 F.4th at 308, the Fourth Circuit reaffirmed *Roach* unequivocally, stating: "[W]e squarely held that there is no 'futility' exception to § 1447(c) remands. If the federal court lacks subject matter jurisdiction, it *must* remand the case." (Emphasis in original). Further, the *Wells* Court indicated that it was "in no position to second-guess" *Roach*. *Id.*

Defendant asserts that "*Roach* misread the Supreme Court's decision in *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, et al*., 500 U.S. 72, 89 (1991)." ECF 30 at 27. I decline defendant's invitation to tell the Fourth Circuit that its decision in *Roach* is erroneous.

Because this Court lacks subject matter jurisdiction, it must remand the case to State court. 28 U.S.C. § 1447(c). The merits of defendant's CAN-SPAM preemption argument, which may well be dispositive of the ultimate viability of the claims, are for the State court to address in the first instance.

**D.**

Plaintiffs seek an award of attorneys' fees pursuant to 28 U.S.C. § 1447(c). ECF 41 at 24–25. Under § 1447(c), "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." However, attorneys' fees are not awarded as a matter of course. Rather, "[a]bsent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). Conversely, "when an objectively reasonable basis exists, fees should be denied." *Id.*

In the Reply, plaintiffs contend that defendant's removal was not merely wrong, but that defendant "intentionally and systematically fabricated and presented non-existent factual allegations" to manufacture standing, by importing allegations about inbox inundation, time spent deleting emails, and imminent risk of improvident purchase that find no basis in the Complaint. ECF 41 at 26. Further, plaintiffs argue that defendant advanced arguments that this district has already rejected in light of *TransUnion*, urged reliance on *Beyond Systems* as though *TransUnion* had not been decided, and drew comparisons to inapposite California and Washington cases arising under a materially different statutory regime. *Id.* at 26–27.

I disagree. Although defendant's contentions did not square with the actual text of the Complaint, the arguments were certainly not frivolous. Defendant's removal was premised on legal arguments regarding Article III standing in the context of anti-spam statutes that, in my view, concern a contested area of law on which courts across the country have reached differing results.

Defendant's arguments were not frivolous. Indeed, plaintiffs conflate a lack of success with frivolity. If anything, it is the attorney's fee request that I regard as frivolous. Therefore, I shall deny plaintiffs' request for attorneys' fees.

**IV. Motion to Strike**

The parties filed a total of nine notices of supplemental authority. *See* ECF 51; ECF 52; ECF 53; ECF 54; ECF 55; ECF 56; ECF 59; ECF 60; ECF 61. In particular, plaintiffs provided six notices, and defendant provided three. Each of the notices set forth cases that had been decided after briefing of the motions was complete. Plaintiffs' notices did not contain any substantive argument, analysis, or interpretation. In contrast, in ECF 56, defendant responded to plaintiffs' notice (ECF 55) with a one-and-a-half-page letter that substantively addressed the cases plaintiffs had brought to the Court's attention. Thereafter, plaintiffs filed the Motion to Strike (ECF 57), contending that ECF 56 constitutes an unauthorized surreply. Plaintiffs point out that I previously granted a motion to strike under similar circumstances. *See* ECF 57 at 2 (citing *Cordish Companies, Inc. v. Affiliated FM Ins. Co.*, 573 F. Supp. 3d 977, 989 (D. Md. 2021), *aff'd,* 2022 WL 1114373 (4th Cir. Apr. 14, 2022)).

Counsel on both sides flooded the Court with nine notices of supplemental authority. Vineyard Vines overstepped by filing a substantive response. But, the resulting Motion to Strike calls for the Court to engage in an unproductive use of its resources. In my view, plaintiffs were too preoccupied with whether they could move to strike, and seemingly did not consider whether it was truly necessary to do so.

The arguments provided by defendant in ECF 56 do not alter the analysis set forth above. Resolving the parties' dispute about its propriety is unnecessary to the disposition of the Motion. Therefore, in the interest of judicial efficiency, I shall deny the Motion to Strike as frivolous.

**V. Conclusion**

Plaintiffs have not alleged a concrete injury-in-fact sufficient to establish Article III standing. *See Spokeo*, 578 U.S. at 341 ("Article III standing requires a concrete injury even in the

context of a statutory violation."); *TransUnion*, 594 U.S. at 426–27 ("Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court."). And, because plaintiffs lack Article III standing, this Court lacks subject matter jurisdiction to hear their claims. *See White Tail Park*, 413 F.3d at 458–59. Therefore, I must remand the case to State court. *See* 28 U.S.C. § 1447(c); *ColonialWebb Contractors Co.*, 2026 WL 1204647, at *3.

For the foregoing reasons, I shall grant plaintiffs' Remand Motion (ECF 6), and I shall remand the case to the Circuit Court for Baltimore County. I shall also deny as moot defendant's Surreply Motion (ECF 43) and plaintiffs' Motion to Strike (ECF 57). Moreover, I shall deny defendant's Motion to Dismiss (ECF 31), without consideration of the merits, and without prejudice to defendant's right to renew the motion in State court.

An Order follows, consistent with this Memorandum Opinion.

Date: May 21, 2026

_____/s/_____
Ellen L. Hollander
United States District Judge

59